UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| TONY GAITER; SEDRICK IRVIN; KEVIN HARRIS; LAWRENCE JONES; SHEVIN SMITH; SANTONIO THOMAS; WARREN WILLIAMS; HENRI CROCKETT; JAMIE NAILS; LEON SEARCY; MARQUIS JOHNSON; LARRY WEBSTER; COREY FULLER; MIKE FINN; ERNEST GIVINS; BEN COLEMAN; DEDRICK DODGE; DAMON GIBSON; MICHAEL GAINES;; DEXTER CARTER; SHOCKMAIN DAVIS; TRACY SCROGGINS; DARRYL ASHMORE; VICTOR FLOYD; COREY SIMON; KELVIN KIGHT; TONY BRYANT; ALBERT BENTLEY; TOBIATH MYLES; WILLIAM FLOYD; CHIDI AHANOTU; QUINN GRAY; CHARLIE CLEMONS; WALLY WILLIAMS; JEFFERY HUNTER; ANTHONY FIELDINGS; DWAN EPPS; and JAMES JOHNSON, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO: _____<br><br>COMPLAINT FOR DECLARATORY RELIEF |
| Plaintiffs, ) | |
| v. ) | |
| NATIONAL FOOTBALL LEAGUE, ("NFL"), a 501 (c)(6) trade organization; MINNESOTA VIKINGS FOOTBALL CLUB, L.L.C.; MIAMI DOLPHINS, LTD.; BALTIMORE RAVENS LP; THE ST. LOUIS RAMS, LLC; NEW YORK JETS, LLC; CLEVELAND BROWNS FOOTBALL CLUB, LLC; PHILADELPHIA EAGLES, LLC; JACKSONVILLE JAGUARS, LLC; ARIZONA CARDINALS CLUB, LLC; PDB SPORTS, LTD., D/B/A THE DEVNER BRONCOS; ATLANTA FALCONS FOOTBALL CLUB, LLC; THE CHICAGO BEARS FOOTBALL CLUB, INC.; INDIANAPOLIS COLTS, INC.; FORTY NINERS FOOTBALL COMPANY, LLC; NEW ENGLAND PATRIOTS, LLC; THE DETROIT LIONS, INC.; PRO-FOOTBALL, INC., D/B/A ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

THE        WASHINGTON        REDSKINS;    )
CHARGERS  FOOTBALL  COMPANY, LLC;    )
KSA INDUSTRIES, INC., D/B/A TENNESSEE    )
TITANS; GREEN BAY PACKERS, INC.; THE    )
OAKLAND  RAIDERS,  LLP; PITTSBURGH    )
STEELERS, LLC; NEW YORK FOOTBALL    )
GIANTS,  INC.;  PANTHERS  FOOTBALL,    )
INC.;  BUCCANEERS  LP; KANSAS  CITY    )
CHIEFS FOOTBALL CLUB, INC.; HOUSTON    )
NFL HOLDINGS LP, D/B/A THE HOUSTON    )
TEXANS; NEW ORLEANS SAINTS, LLC;    )
BUFFALO        BILLS,        LLC;        DALLAS    )
COWBOYS    FOOTBALL    CLUB,    LTD.;    )
FOOTBALL NORTHWEST, LLC, D/B/A THE    )
SEATTLE  SEAHAWKS;  and  CINCINNATI    )
BENGALS, INC.,    )
    )
                Defendants.

_____

## PLAINTIFFS' COMPLAINT

Plaintiffs, by and through their undersigned counsel, bring this Complaint against

Defendants.

## NATURE OF THE ACTION

1.      Scientific verification of CTE in living subjects is currently available, and is no

different from ALS diagnosis probabilities. Essentially, living-CTE has now become clinically

diagnosable to the same extent that living-ALS has become recognized as being clinically

diagnosable.  In so being, this action seeks declaratory relief for living NFL players, as Plaintiffs,

who are seeking workers' compensation benefits from Defendants-employers for, but not limited

to, being unduly exposed to and sustaining repeated head trauma and the subsequent fatal

degenerative brain disorder that manifests as a latent onset diagnoses of Chronic Traumatic

Encephalopathy ("CTE"); injuries which occurred (1) in the course of, and (2) have arisen out of

Plaintiffs' employment with the NFL. Further, this action seeks a declaration that the NFL as

employers - inclusive of the 32 individual teams within the League - and the Workers' Compensation Board of each state that hosts an NFL team ("Defendants" collectively) officially acknowledge successful current and prevailing medical advancements in the diagnosis of CTE in living claimants, and to provide workers' compensation benefits for CTE as a distinct occupational disease. As such, CTE should rightfully be compensable under Article 41, "Workers' Compensation," Article 58, "88 Plan," and Article 65, "Neuro-Cognitive Disability Benefit" of the operative 2011 NFL Collective Bargaining Agreement as amended August 4, 2015 (CBA), as well as under the workers' compensation statutes of each of the Defendant-states. *See generally* Cal. Lab. Code § 77(a), Occupational Diseases; NY CLS Art. 3, Occupational Diseases; Kan. Stat. 44-5a01, Occupational Diseases. This action also seeks to recover fair compensation for the spouses of the player-Plaintiffs based upon their right to seek loss of consortium.

2.      Along with the general legislative intent of workers' compensation laws having a remedial effect upon employers, securing compensation for injuries arising out of and during the course of employment is a fundamental principle underlying workers' compensation law.

3.      Plaintiffs have sustained excessive and undue occupational head trauma, including severe concussions and frequent sub-concussive head injuries, which have unquestionably occurred in the ordinary course of each of the named Plaintiffs' NFL tenure.

4.      As alleged herein, the Defendants routinely failed to care for Plaintiffs' repetitive head injuries during their career in any medically competent or meaningful manner that complied with any known published contact sports return-to-play guidelines at the time in which the injuries occurred.

5.      CTE with delayed onset, by its nature, often manifests years after the initial series of repetitive head trauma events. The purpose of the 'Occupational Disease' sections in many of

the named Defendant-states' workers' compensation statutes is to offer a remedy to such workers who have sustained occupational injuries that are characterized by a latent manifestation and diagnosis, such as CTE.

6.     Unfortunately for Plaintiffs, NFL Defendants have vigorously upheld their long-standing and now erroneous viewpoint that a retired player's diagnosis of living CTE cannot definitively be linked to in-play head trauma. Further, these Defendants insist that, even if the incidence of CTE is a direct result of severe head trauma sustained by players during their careers with the NFL, that CTE is not diagnosable in living players. For these spurious reasons, CTE has not been considered an independent compensable injury under the NFL's workers' compensation framework. Based upon the Defendants' outdated, wrongful and fraudulently misrepresented causation assessment of CTE and its current and proven diagnostic technology, Plaintiffs' ongoing and progressive long-term care requirements, which definitively result from their having sustained latent onset CTE during their terms with the NFL, are not being provided for by their employer(s). The operative (2011) NFL Collective Bargaining Agreement clearly states, "a Club will either voluntarily obtain coverage under the [workers'] compensation laws of that state or otherwise guarantee equivalent benefits to its players."[1] The NFL-Defendants' practice of denying workers' compensation benefits specifically for CTE persists in contravention of the fact that many workers' compensation statutes state: "[T]he disablement or death of an employee resulting from an occupational disease … shall be entitled to compensation."[2]

7.     Today, there is strong empirical evidence of readily available medical procedures for diagnosing CTE in living subjects. And, there is equally strong evidence that there is an

---

[1] NFL Collective Bargaining Agreement, Article 41 Workers' Compensation (August 4, 2011), https://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-2011-2020.pdf
[2] Fla. Stat. § 440.151(1)(a); Cal. Lab. Code § 77(a);

overwhelming preponderance of living retired NFL players who are currently suffering from CTE and experiencing extreme financial hardships as a direct result of this fatal and progressive occupational disease. Meanwhile, the NFL-Defendants continue to deny the statistically verifiable connection between severe repeated in-play head trauma and latent onset CTE, and they tenaciously cling to a stagnant and outdated position that the diagnosis of CTE in living subjects is not currently viable when it assuredly *is* viable. There is well-published empirical evidence that successful CTE diagnosis in living players has been adequately accomplished, and there is undeniable evidence that CTE is arising in staggering numbers within the population of retired professional football players later in their lives. The development of CTE in retired football players is nearly inevitable, and alas, Defendants insist on continuing to deny Plaintiffs' of their deserved CTE-specific workers' compensation benefits..

8.     The workers' compensation relief Plaintiffs are seeking will be based upon their claims that they have now become permanently and totally disabled by CTE as a result of repeated traumatic head injuries that were, in fact, sustained while they acted in the capacity of employees for the Defendants. Our plea for declaratory relief rests upon four significant misgivings that Defendants have historically and unrelentingly demonstrated, thereby leading Plaintiffs to believe that Defendants will deny their applications for CTE-specific workers' compensation: 1) That, for many decades, Defendants have been aware of and continue to deny latent onset CTE (or previous monikers describing the same condition) which directly results from earlier, in-play, severe head trauma sustained by their employees; 2) That Defendants, for their own financial gain, have historically promoted and continue to promote on-the-field behavior that definitively results in excessive severe head trauma in players; 3) That Defendants intentionally deny the overwhelming preponderance of evidence revealing an acute statistical connection between CTE and earlier head

trauma events, and that CTE is currently adequately diagnosable in living subjects; and 4) That Defendants have traditionally and intentionally denied its players the right to fair, CTE-specific, notice of unsafe work conditions and occupational hazards, in direct violation of the Occupational Safety and Health Act of 1970 ("OSHA").[3]

9.      In summary, due to Defendants' historic and current tendency to deny verified scientific, empirical, and statistical evidence relating to CTE, they will more than likely deny Plaintiffs' workers' compensation claims seeking relief for the ongoing expenses that pertain specifically to each player-Plaintiffs' individual incidences of CTE. For these reasons, in the name of judicial efficiency, we are seeking preemptive declaratory relief on this matter in order to avert the anticipated prolonged litigation for thousands of retired NFL players that would be required in order to rectify these issues after Defendants have already denied Plaintiffs' of their deserved CTE-specific workers' compensation benefits.

## CAUSAL LINK BETWEEN IN-PLAY HEAD TRAUMA AND LATENT ONSENT CTE

10.      Not only have Defendants been negligent in failing to adequately care for Plaintiffs' traumatic head injuries during and after their careers, they have habitually failed to sufficiently forewarn players of the excessive occupational risks involved in sustaining repeated concussions and head trauma - in violation of OSHA.[4] They have also been notoriously reckless in engendering a mode of game-play where "head banging" and "using the helmet as weapon" is not only facilitated but is encouraged for the purpose of adding visual interest to the game.[5] But most discouraging, Defendants have also been spinning and publishing a web of distorted science for decades that, in effect, trivializes and even denies the causal link between repeated in-play

---

[3] 29 U.S.C.S. § 651(6-9). (LexisNexis, Lexis Advance through PL 114-244, approved 10/14/16).
[4] *Id.*
[5] Jill Martin, *Former Player Files New Lawsuit Against NFL Over CTE Link*, CNN (March 29, 2016), http://www.cnn.com/2016/03/29/health/nfl-cte-scroggins-lawsuit/

head trauma and the probable development of CTE. Defendants have embraced this 'junk science' when, in fact, it has been otherwise proven that CTE is an irreversible, progressive, and fatal degenerative disease of brain tissue that is directly linked to repeated severe head trauma, similar to that which Defendants promote. This overwhelming evidence has been readily available to Defendants for many, many years. Yet, they have been excruciatingly reluctant to subscribe to the majority of these scientific findings, and they continue to promote their biased version of the evidence.

11.     Defendants have a long history of conjuring and promulgating maligned scientific studies and medical research, which have been observably devised to complement their financial state of well-being. Strikingly, NFL-Defendants have been handling this health crisis similar to that of the tobacco industry, which is known for using questionable science to minimize the dangers of cigarettes. Defendants have gone so far as to hire many of the same lobbyists, lawyers and consultants that have become infamous for representing the big tobacco companies in the same manipulative manner.

12.     As early as 1994, Defendants formed a committee that would ultimately issue a succession of research papers playing down the long-term danger of head injuries. In 1997, Defendants retained Dorothy C. Mitchell, a Harvard Law School graduate who was concurrently representing the Tobacco Institute, which is the tobacco industry trade group. Further, a co-owner of the New York Giants, Preston R. Tisch, was also part owner of the leading cigarette company, Lorrilard. And, Mr. Tisch was a board member of the Tobacco Institute and the Council for Tobacco Research, two entities that played a central role in misusing science to hide the risks of cigarettes.[6]

---

[6] *See* http://www.nytimes.com/2016/03/25/sports/football/nfl-concussion-research-tobacco.html?smprod-nytcore-ipad&smid=nytcore-ipad-share

13.     In 2003, the Defendants' concussion committee began publishing in the Medical Journal of Neurosurgery. The committee stated that it had analyzed *all* concussions diagnosed by the League's medical staffs from 1996 through 2001 – 887 in all. Later, however, the New York Times found that most of the teams had failed to report all of the players' concussions.[7] A multitude of head injuries diagnosed by team doctors were missing from the study.

14.     For more than 35 years, until the August 4, 2011 Collective Bargaining Agreement with the NFL players Association was signed, the Defendants have continuously and vehemently denied that it knew, should have known or believed that there is any relationship between NFL players suffering from traumatic head injury sustained while playing football and CTE.[8] They have held strong to this falsity even in light of the markedly increasing incidences of long-term mental health ailments in their current and retired players, such as abnormal rage, impulsivity, depression, confusion, memory loss, and ultimately advanced dementia; which are all tell-tale indicators of CTE.

15.     Because the scientific understanding of latent onset CTE was somewhat new and still developing in the 2000's and early 2010's, NFL-Defendants took every strategic advantage of this fact to capitalize on the nascent public awareness of the disease by infusing as much contradictory and confusing misinformation into the media as possible.

> Beginning in 2005, a ground-breaking series of clinical and neurological studies performed by independent scientists demonstrated that multiple NFL concussions cause cognitive problems such as depression and early-onset dementia. In response to those studies, members of the NFL Concussion Committee denied knowledge of a link between concussions and cognitive decline and claimed [that] 'several more years' of research were required.[9]

---

[7] *Id.*, *See* also, http://www.nytimes.com/2016/03/25/sports/football/at-least-100-concussions-left-out-of-nflstudies.html?smprod=nytcore-ipad&smid=nytcore-ipad-share
[8] http://nflconcussionlitigation.com/?p=1752
[9] 28 Ent. & Sports Law. 9 (2010-2011). Online at http://heinonline.org/HOL/LandingPage?handle=hein.journals/entspl28&div=26&id=&page

Several more years have, in fact, transpired between 2005 and 2016, and yet much of the professional sports industry is *still* attempting to confuse and manipulate the public's understanding of the connection between severe head trauma and latent onset CTE, primarily to avoid liability. As recently as July 27, 2016, in response to an inquiry from U.S. Senator Blumenthal from Connecticut, "NHL commissioner Gary Bettman restated his belief that there is no proven connection between concussions and the degenerative brain disease chronic traumatic encephalopathy (CTE)."[10] In that same league of highly profitable sports institutions, NFL-Defendants also regularly express similar attitudes of denial . . . on a prolific basis. Their blatant denials are still regularly spewed forth in NFL publications, NFL sponsored so-called medical studies, testimony of NFL representatives before Congress, and in the media.[11] These Defendants commonly employ a subversive strategy, again mimicking the tobacco industry, which has been to "Manufacture doubt: Doubt is [their] product since it is the best means of competing with the 'body of fact' that exists in the minds of the general public. It is also the means of establishing a controversy."[12] NFL-Defendants boast a long and well-rehearsed history of such denials and manipulation, boldly counter-responding to verifiable medical and scientific studies that indicate a definitive causal connection between traumatic brain injury sustained while playing in the NFL and latent onset CTE. Like Big Tobacco, Big Pharma, *et.al.*, NFL-Defendants know that it is much easier to debate the science than to debate the logic.[13]

16.     When it comes to reality, however, upon inquiry whether there is an actionable connection between repeated professional sports-related traumatic head injuries and latent onset

---

[10] *Commissioner Gary Bettman denies link between concussions, CTE*, Sports Illustrated (July 27, 2016), http://www.si.com/nhl/2016/07/27/commissioner-gary-bettman-denies-link-between-concussions-cte
[11] Alex Reimer, *The NFL's Crusade to mask the dangers of head trauma looks worse than ever*, Sports Blog Nation (March 28, 2016), http://www.sbnation.com/nfl/2016/3/28/11250362/nfl-concussions-cte-connection-roger-goodell-comments
[12] David Michaels, Doubt is Their Product: How Industry's Assault on Science Threatens Your Health, Oxford Press, 2008.
[13] http://nflconcussionlitigation.com

CTE, the statistical and scientific evidence is very difficult to deny; even though many professional sports organizations have become expert at this craft.

17.     From a statistical point-of-view, the incidences of professional athletes, especially retired football players, presenting with the horrific symptoms of CTE, being clinically diagnosed with CTE, or having been found to have CTE through autopsy studies (whose deaths have more than usually resulted from CTE-related brain tissue degeneration, CTE-related dementia, or CTE-related suicide (and homicide)) simply abound. From a shear statistical perspective one would have to be in complete denial not to acknowledge that repetitive traumatic head injuries occurring earlier-on will more than likely result in degenerative CTE later in life; if a player lives that long.

18.     In September, 2014, Dr. Ann McKee, Director of the world's largest brain bank at Boston University, announced that "76 of 79 Deceased NFL players were found to have CTE."[14] Then, in late 2015, The Department of Veteran Affairs and Boston University published continued results on this study revealing that "of almost 100 deceased NFL players over 95% of them tested positive for CTE."[15] Dr. Walter Koroshetz, Director of the National Institute for Neurological Disorders and Stroke, recently stated, "[CTE] seems to be *much* more common than anybody imagined … I think we have a significant problem that's getting bigger as we see this pathology is more common."[16] (*emphasis added*).

19.     From a scientific perspective, Dr. McKee's empirical findings indicate that, "CTE occurs when repetitive head trauma begins to produce abnormal proteins in the brain known as 'tau' The tau proteins work to essentially form tangles around the brain's blood vessels,

---

[14] Jason M. Breslow, *76 of 79 Deceased NFL Players Found to Have Brain Disease*, Frontline (September 30, 2014), http://www.pbs.org/wgbh/frontline/article/76-of-79-deceased-nfl-players-found-to-have-brain-disease/
[15] John Breech, *Study: 95.6 Percent of Deceased NFL Players Tested Positive for CTE*, CBS Sports (Sept. 19, 2015), http://www.cbssports.com/nfl/news/study-956-percent-of-deceased-nfl-players-tested-positive-for-cte/
[16] *Id.*

interrupting normal functioning and eventually killing the nerve cells themselves."[17] Further, Dr. McKee has determined four pathological stages of CTE in living patients, similar to a cancer diagnosis.[18] Each of the four stages of CTE ties pathological criteria (i.e., levels of the tau protein deposits in the brain) to degree and nature of symptoms in living retired professional athletes and military personnel. Examples of these symptoms are: Stage 1, persistent headaches; Stage 2, depression/exclusivity; Stage 3, cognitive and executive function impairment; Stage 4, full-blown dementia.[19]

20.    Pertinent to these findings, in January of 2016, an interdisciplinary team of researchers at the University of Pennsylvania has made a breakthrough in the understanding of how traumatic head injury actually causes CTE on a molecular scale:

> To summarize, tau is a critical brain protein that plays a significant role in the elasticity of axons within brain cells. Tau is 'viscoelastic,' which is like silly putty; soft and stretchy, but will shatter when hit by a hammer. The tau protein is what connects the axons of the brain to one another. The *rate* at which an external strain or stretching action is applied to a tau protein determines how far they can stretch without breaking. The heads of the tau protein are embedded in the axon and the tails are free-floating so they may attach to the tails of other tau proteins. During normal everyday motion of the human body the tails of the tau proteins will continually detach and reattach to one another based upon their elasticity. Essentially, the frequent binding and unbinding of the tails of the tau protein allows the axons to slide relative to one another without damage. This dynamic keeps the neural axons fluid in space, sufficiently buffered, and healthy.
> However, the rapid jolt caused by a concussive tackle or blast does not allow for this process to take place. When tau proteins are jolted abnormally rapidly they will break and fail to function as a lubricant or shock absorber for the axons; which in turn receive the full force of a head/brain impact (i.e., the axons improperly receive the brunt of the impact of a concussive event). This form of external head impact then causes permanent damage to the neural axons (nerves) within the brain tissue, especially when it occurs on a repetitive basis. Over time, these 'broken' tau proteins aggregate in areas of the brain. Notably, aggregation of

---

[17] *Id.* Jason M. Breslow, Frontline. *See also* Ann McKee, M.D., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, National Center for Biology Information (Oct. 2013), https://www.ncbi.nlm.nih.gov/pubmed/23208308
[18] Brenda L. Mooney, *New CTE Study Categorizes Stages of Degenerative Brain Disease in Veterans, Athletes*. U.S. Medicine (January 2013), http://www.usmedicine.com/agencies/department-of-veterans-affairs/new-cte-study-categorizes-stages-of-degenerative-brain-disease-in-veterans-athletes/
[19] *Id.*

the same tau protein is implicated in CTE, which is found in athletes with a
history of multiple concussions.[20]

21.     There is also a wealth of other existing and developing empirical scientific and

statistical research that unquestionably suggests a link between early head trauma and later CTE.

Still, the NFL, *et.al.*, has worked tirelessly for decades to refute the outpouring of evidence

describing this undeniable connection between in-play repeated traumatic head injuries and latent

onset CTE. As noted above, to this day the contortion of scientific evidence on the subject, and

the subsequent denial of the connection between severe head trauma and CTE persists among

professional sports organizations. Most unfortunately, and consequently, the NFL has also shown

a real propensity not to provide workers' compensation benefits specifically for CTE in living

retired player-Plaintiffs. One of the NFL-Defendants' many ongoing defenses that we frequently

hear in the news is their wrongful assertion that the connection between head trauma sustained

while playing in the NFL and the latent onset of CTE has not been proven. This is quite

obviously a fallacy. In so being, a primary goal of this plea is to obtain a judicial mandate that

NFL-Defendants amend their Collective Bargaining Agreement to officially provide workers'

compensation benefits for CTE as a distinct and compensable occupational disease; for the

operative NFL Collective Bargaining Agreement to specifically acknowledge that CTE is more

than likely to result directly and indisputably from the repeated traumatic head injuries that are

sustained by professional football players during their careers. Notwithstanding, the NFL's

denials persist, and professional football teams still flagrantly encourage violent head-banging

confrontations between teams in order to bolster viewership. It is their business.

22.     As time goes by, the more and more that players are presenting with the egregious

tell-tale signs of CTE, the more and more that autopsies of football players are being performed

[20] Evan Lerner, *Penn Study Determines Breakaway Protein is Critical in Concussions*, Penn Current (January 14, 2016),

finding severe CTE, the more and more that confirming statistics tying professional sports to CTE are published, and the more and more that affirmative concussion-to-CTE studies are announced by world renowned medical research facilities, the more fraudulent NFL-Defendants appear when they stand in front of a microphone and say, "the link between game play head injuries and CTE has not been proven." Therefore, in small dribs and drabs, and as expected, executive representatives of the NFL are begrudgingly beginning to publically admit to the (almighty) connection between in-play repetitive head injuries and the near inevitability of CTE, although they still haven't officially admitted to this absolute connection on an institution-wide basis; only a random NFL staff member will allude to the connection here and there, and then shortly thereafter another staff member or executive will broadcast doubt on the subject. However, the multitude of retired NFL players who are currently suffering with CTE have no doubt about whether CTE is a direct result of traumatic head injury sustained during their NFL careers. In a 2016 interview with CBS, Plaintiff Tracy Scroggins, stated, "Players with a history of concussions are being linked to their brains turning to mush in retirement."[21]  He is unabashedly coming out to the press about the NFL and CTE because he wants inform society of this tragedy before his "mind slips away."[22]

23.     It appears that the causation factor has essentially been met, and Defendants are slowly acknowledging this fact. But, they are not giving up on their denial and deflection game just yet. Now, they are focusing their proverbial weapons of denial and manipulation on the next logical target in order *not* to provide CTE-specific workers' compensation benefits:  Diagnosis in living players.

---

[21] David Sutta, *Concussions: The Hard Knock Truth*, CBS Miami (April 28, 2016), http://miami.cbslocal.com/2016/04/28/concussions-the-hard-knock-truth/
[22] *Id.*

## PRESENT DIAGNOSIS OF CTE IN LIVING SUBJECTS

24.     The crux of our argument centers around the fact that, within the past two years at minimum, the medical diagnosis of CTE in living players has now become viable. Yet, Defendants relentlessly continue deny this science, deny the statistics, and are obviously apt to deny retired players who are living with CTE the CTE-specific workers' compensation benefits that they genuinely deserve. These truths make our declaratory complaint ripe for judicial review. According to *Abbott Laboratories v. Gardner*, 387 U.S. 136, the basic rationale of the ripeness doctrine is to prevent the courts from entangling themselves in abstract disagreements.[23] Not only is our complaint for declaratory relief no longer in the realm of abstract, but by finding in favor of player-Plaintiffs in this matter this court will be averting a guaranteed deluge of judicial and administrative entanglements. The number of retired living players proposed to be diagnosed with CTE will increase geometrically as the diagnostic technology continues to rapidly advance, and Defendants will more than likely continue to deny CTE-specific workers' compensation benefits to the living victims of this occupational disease. Therefore, the administrative law system and the judiciary are sure to become further and needlessly entangled in deciding CTE-related workers' compensation cases unless Defendants are mandated to acknowledge that living CTE is a compensable occupational disease under their workers' compensation standards. The first step to this acknowledgement would be for Defendants to accept the realization that CTE in living subjects is now adequately diagnosable. But alas, rebutting this fact has enigmatically become NFL-Defendants' latest calling.

---

[23] *Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S. Ct. 1507 (1967)

25.     A prime example of the entanglement of the judicial and administrative system that is just beginning to heat up as it relates to CTE-specific claims is the California workers' compensation case, *Duckworth v. L.A. Rams*, (2015). In 2013, after having retired from the NFL 27 years before, in 1986, ex-NFL player, Bobby Duckworth, filed a workers' compensation claim with the NFL based upon his sustaining cumulative industrial injuries to his brain and nervous system, including cognitive pain and behavioral disorders, as directly relating to repetitive high velocity impacts that occurred while playing professional football.[24] The purpose of Mr. Duckworth's claim was to receive workers' compensation benefits specifically intended to help him financially cope with the burden of living with CTE. As expected, the NFL workers' compensation department denied Mr. Duckworth coverage for his latent onset CTE claim. He proceeded with an appeal, and the Workers' Compensation Judge (WCJ) found for Plaintiff. NFL-Defendants then filed a petition for reconsideration of the WCJ's decision to permit Mr. Duckworth to receive the requested benefits. Defendants' workers' compensation insurance carrier avidly vied for the California Workers' Compensation Appeals Board to deny Plaintiff's latent onset CTE claim. The Board upheld the WCJ's decision and denied Defendants petition. Most informative in this opinion, Commissioner of the Board, Jose H. Razo, states:

> 1) At the time of injury there was no evidence that Mr. Duckworth knew, or should have known that he had a claim for cumulative brain injury, 2) The current issue is one of brain injury or more precisely chronic traumatic encephalopathy [CTE], a progressive degenerative condition of the brain caused by repeated blows to the head that was previously not diagnosable until autopsy after death, 3) Recent advances in PET scan imaging and serum testing of brain proteins may now aid in the detection and confirmation of this latent process before death, 4) Until very recently the type of brain injury Mr. Duckworth has could only be confirmed by autopsy. **Now, it is supposedly possible to obtain tentative confirmation of a diagnosis [of CTE] through PET scan technologies**, 5) I had attempted in my original opinion to parallel the circumstances and eventual resolution of asbestos claims, a latent insidious disease process where applicants would not know they had been injured until they were already in end stage and terminal.

---

[24] *Duckworth v. L.A. Rams*, 2015 Cal. Wrk. Comp. P.D. LEXIS 627

One has to look at this new emerging area of occupational injury through the lens of latency in order to view it clearly.[25] (*emphasis added*).

26.    This case is not only an example of Defendants' unending defiance, it is also an example of a trend in the enlightened opinions of administrative law judges that CTE should, in fact, be specifically compensated under the nationwide workers' compensation regime. This enlightenment is based upon factual, readily available evidence that the occupational disease CTE, with horrific symptomatology, is now able to be diagnosed in living players. It is noteworthy that the acceptance of the varying living-CTE diagnostic procedures (discussed below) have already filtered their way into the language of the judiciary. And, what is crucial to this argument, is the fact that NFL-Defendants are revealing a disturbing and devious trend of denying players' CTE-specific workers' compensation claims visa vie their denial and/or manipulation of empirical scientific diagnostic evidence that CTE is, in fact, detectable in living subjects.

27.    A few ground-breaking living-CTE diagnostic procedures have arisen as successful in the past few years, as well as other methodologies that are also being rigorously tested. Before describing the current diagnostic procedures for determining whether a living subject has CTE, a short discussion of the validation and verification procedure for these state-of-the-art diagnostics is in order. The traditional way to verify if a living-CTE diagnostic test is valid is to confirm the results later by autopsy. Because advanced procedures in living-CTE diagnosis are relatively new there is not yet a broad sample, if you will, of NFL players who have tested positive for CTE within the past few years and then have subsequently died, thereby enabling their living-CTE diagnoses to be verified by autopsy. Since the current living-CTE

---

[25] *Id. See* § III Discussion

diagnoses have begun to gain serious footing and recognition by the scientific/medical community in 2012, the technology has advanced geometrically in the following four years up to present day. Yet, there is still the diagnosis-verification challenge that not very many players who have tested positive for CTE during their lifetimes (in the past four years) have since died. In fact, many of the retired and current NFL players who are more than likely living with CTE have not been formally tested because they know that even if they test positive under one or more of the current diagnostic procedures that they still will not receive financial assistance in the form of workers' compensation, or assistance from the recent NFL settlement, to help them with the ongoing expenses of living with CTE.[26]

28.     Addressing the issue regarding the fact that there is a definitive array of advanced diagnostic procedures for detecting CTE in living subjects, and that not enough CTE candidates who have tested positive have died yet, there are two noteworthy factors that warrant serious public policy consideration in favor of NFL-Defendants being mandated to amend their Collective Bargaining Agreement to include CTE- specific workers' compensation coverage. First, the number of retired NFL players naturally increases every year, so there is an increasingly large population of potential claimants, retired NFL players, who are and will be suffering the debilitating effects of living with CTE that directly results from head trauma sustained while playing in the NFL. Presently, these players will not receive living-CTE settlement funds or workers' compensation. And, due to their CTE-related symptoms, these retired NFL players are unemployable. Therefore, the players are more than likely to become

---

[26] *In Re National Football League Players' Concussion Injury Litigation; 2013 Jury Verdicts*, LEXIS 7849, 2:12-md-02323-AB, August 29, 2013 (Players diagnosed with Alzheimer's disease were eligible for up to $ 5,000,000.00, players diagnosed with dementia would receive up to $ 3,000,000.00, and families of deceased players diagnosed with chronic traumatic encephalopathy would receive up to $ 4,000,000.00). *See also, In Re National Football League Players' Concussion Injury Litigation; Class Action Settlement Agreement as of June 25, 2014*, 2:12-md-02323-AB, MDL No. 2323, https://www.nflconcussionsettlement.com/CourtDocs.aspx; "7. Class Action Settlement Agreement with Exhibits (Filed June 25, 2014)".

financial burdens of state welfare programs and/or the players' families. Further, adding to the population of ailing retired NFL players is the fact that "more and more players are retiring early in increasing numbers year after year."[27] Much of the rationale for this alarming trend was stated succinctly by "24-year old Adrian Coxson, who decided to retire after suffering a concussion, saying 'the next hit could possibly kill me.'"[28] As a harsh reminder, CTE has been confirmed in deceased football players as young as 18 years old.[29] CTE was found in "Owen Thomas, a college football player who hanged himself when he was 21."[30] And the devastating list goes on and on. So, even though a player may retire early from the NFL, the probability realistically exists that they are still candidates for CTE-specific workers' compensation; thereby adding to the burgeoning population of retired players that are being denied their rightful benefits, and concurrently adding to the financial burden of the state. These facts make for a compelling public policy reason for the NFL to add CTE-specific benefits to the workers' compensation language in their Collective Bargaining Agreement.

29.     Secondly, due to the quality of current CTE diagnostic technology with a growing number of autopsy confirmations,[31] the scales of justice and public policy are now tipping to weigh heavily in favor of *not* permitting the NFL-Defendants to implement the rationale that there is not enough proof yet to show that living CTE diagnostics are accurate, thereby giving them cause to deny CTE-specific workers' compensation coverage. It has now become a veritable and undeniable connect-the-dots basis of logic justifying a positive analysis that a living

---

[27] Cork Gaines, *The NFL has Another Big Problem – More and More Players Are Retiring Early*, Business Insider (Feb. 1, 2016), http://www.businessinsider.com/calvin-johnson-latest-young-nfl-player-retiring-early-2016-2
[28] *Id.*
[29] *18 Year Old High School Football Player*, Boston University CTE Center, http://www.bu.edu/cte/our-research/case-studies/18-year-old/
[30] Jason Breslow, *High School Players Face Bigger Concussion Risk*, PBS Frontline, (October 31, 2013), http://www.pbs.org/wgbh/frontline/article/high-school-football-players-face-bigger-concussion-risk/
[31] William Weinbaum, *Fred McNeil's Death Could be Milestone in Determining CTE in Living Players*, ESPN (Feb. 4, 2016), http://www.espn.com/espn/otl/story/_/id/14714852/fred-mcneill-had-cte-identified-was-alive

player factually has the occupational disease of CTE. The flow of logic goes something like this: (1) A claimant was employed by NFL-Defendants as a football player; during which time the claimant-player sustained traumatic head injury, including but not limited to concussions, regardless of how long the player had been employed by said Defendants or whether that head injury was recorded by the NFL; (2) the player presents with clinical and persistent symptoms of CTE; in any of the four stages, whether the player has been retired from the NFL for one day or forty years (or is still employed by Defendants); (3) the player then undergoes neuropsychological testing to verify and document his CTE-related symptoms; (4) the player tests positive for CTE via one or more of the following advanced diagnostic procedures; (5) the claimant-player proves need of financial assistance that is definitively related to and caused by his living with CTE, which has resulted from his in-play traumatic head injuries. If all of these elements are met it should be a rebuttable presumption that the claimant has CTE as an occupational disease directly related to his professional NFL in-play head injuries. Therefore, the player-claimants should be entitled to workers' compensation benefits designed to assist them specifically with the ongoing financial needs that are related to living with CTE. As long as the player can substantially assert by a preponderance of the evidence that his traumatic head injuries that were sustained while playing for the NFL are a substantial contributing or even an exacerbating factor for his development of CTE, he should be entitled to workers' compensation benefits for such.

      30.    The financial needs tied to one's living with CTE go well beyond the end-stage dementia. Players living with CTE regularly suffer non-employability and financial destitution due to the earlier-stage symptoms of the disease, such as chronic insomnia, depression, severe mood disruption, isolationism, memory loss, deterioration of motor and visual-spatial skills, and

the list of debilitating CTE-related impairments goes on. Many of the Plaintiffs are experiencing devastation of their family and social lives as well as acute financial ruin due to their inability to work as a direct result of their CTE-related symptoms. A meaningful example of CTE-related unemployability is Tony Gaiter. Mr. Gaiter was wide receiver for the New England Patriots and the San Diego Chargers in the late 1990's who was recently found homeless, living in a cardboard box under a bridge in Miami.[32] This is just one example of the financial devastation CTE leaves in its wake. Mr. Gaiter has qualified as a 1.5 on the Clinical Dementia Rating scale, thereby qualifying him a class member for the recent NFL settlement, which also does not compensate players living with CTE under its terms; only deceased players who are found to have CTE based upon autopsy results will recover under this settlement as it stands. The judicial approval of this settlement is currently being appealed to the U.S. Supreme Court via multiple Petitions for Writ of Certiorari and with multiple Amicus Briefs vying for the settlement to be extended to players living with CTE. This settlement is a prime example of how wrongfully influential NFL-Defendants are when it comes to denying much needed workers' compensation benefits to their past and present (and future) employees who are living with CTE.

31.     Again, CTE is a bona fide degenerative and irreversible disease of the brain tissue that is much more than an isolated incident of a headache, forgetfulness, depression, excessive confusion, or signs of dementia. These are all just symptoms of the broad, more inclusive fatal disease of CTE; much like body-pain, shortness of breath, or headaches can be symptoms of cancer. If an employee contracts cancer from toxins in his/her work environment, that employee will be entitled to workers' compensation benefits specifically to assist them with the financial needs brought about by their living with the occupational cancer, not just for the shortness of

---

[32] Neil Epstein, *Telephone Interview with Tony Gaiter* (Oct. 11, 2016), Howard & Associates, PA

breath, headaches, body-pain, etc. that are the symptoms of the cancer. Why isn't the fatal

occupational disease of CTE treated in the same way by the national workers' compensation

regime, and subsequently by the NFL? In 2012, when they did an autopsy of Ralph Wenzel, who

played as guard in the NFL 38 years before his death, they found severe CTE in his brain, which

had literally shrunk his brain to half its size. [33] Dr. Eleanor Perfetto, Mr. Wenzel's widow (who

testified before congress on this same matter[34]) stated that as early as 1994, "It felt as if there

were a door shut in his brain that he could not open."[35] Meanwhile, for those 18 years prior to

Mr. Wenzel's death, as he and his family were grappling with the progressive emotional and

financial burdens that CTE brings, he was continually denied CTE-specific workers'

compensation benefits by the NFL. According to Ronald Feenberg, counsel for the Wenzel

estate, to this day, "The Wenzel/Perfetto litigation is still pending in the courts."[36]

32.     Presently, the NFL's operative Collective Bargaining Agreement, or the workers'

compensation laws for any state, do not provide specifically for CTE. In fact, many states, such

as Florida, specifically exclude professional athletes, at large, from coverage by workers'

compensation statutes; much less covering them for the occupational disease of CTE.[37] The NFL

insists on clinging to the outdated position that living-CTE is not diagnosable and therefore

players who are claiming CTE-specific damages are not entitled to workers' compensation

benefits under the Collective Bargaining Agreement. The multitude of retired NFL players

currently living with CTE are suffering greatly due to NFL-Defendants' resistance to cover CTE

---

[33] Tim Rohan, *A Football Widow's Traumatic Journey*, NYT (Apr. 8, 2013),
http://www.nytimes.com/2013/04/09/sports/football/eleanor-perfettos-journey-coping-with-dementia-and-death-of-former-nfl-player-ralph-wenzel.html?_r=0
[34] *Football Player Head Injuries, Panel 2*, C-SPAN (Oct. 28, 2009), https://www.c-span.org/video/?289685-3/football-player-head-injuries-panel-2
[35] *Id.*
[36] Neil Epstein, *Email Correspondence with Ronald Feenberg, Esq.* (Sep. 28, 2016), Howard & Associates, PA
[37] *See* Fla. Stat. § 440.02(17)(c)3

under their workers' compensation plan. The time has come for the NFL Collective Bargaining Agreement, and related state workers' compensation laws to be amended to compensate specifically for CTE in living professional athletes.

33.     In January of 2016, a new CTE diagnostic procedure was published, called the TauSome test, which has since received a great deal of attention in the media and within the scientific neurological research community. This is a simple, but innovative new blood test. The preliminary findings of the TauSome test "indicated that plasma exosomal tau was significantly heightened in former NFL players in comparison to the control group. In addition, the number of tau positive plasma exosomes in the former NFL players was significantly correlated with performance on standardized tests of memory and psychomotor speed, with higher level [of exosomal tau] resulting in worse performance."[38] Recall Dr. McKee's 2013 findings that identified a correlation between traumatic head injury, the subsequently damaged tau protein, and the degenerative nature of CTE; "there is an ordered and predictable progression of hyperphosphorylated tau abnormalities through the nervous system in CTE that occurs in conjunction with widespread axonal disruption and loss. The frequent association of CTE with other neurodegenerative disorders suggests that repetitive brain trauma and hyperphosphorylated tau protein deposition promote the accumulation of other abnormally aggregated proteins."[39] Dr. McKee's findings were originally deduced from autopsy studies. But the recently published, aforementioned, TauSome blood test now determines if there is are elevated levels of 'exosomal tau' in the blood plasma of living subjects. And, the higher levels of exosomal tau in the living blood system, which are ascertained by the TauSome test, are being empirically and

---

[38] Alice Weatherston, *Potential Test to Detect Chronic Traumatic Encephalopathy in Living Patients*, Neurology Central (Feb. 2016), https://www.neurology-central.com/2016/02/29/potential-test-to-detect-chronic-traumatic-encephalopathy-in-living-patients/
[39] *See* National Center for Biology Information, *Supra*

systematically correlated to the overt symptoms of CTE specifically (i.e., Dr. McKee's four stages of CTE). Therefore, these exaggerated levels of exosomal tau that are detected by the TauSome test in living subjects are now being deemed as "noninvasive CTE biomarkers" by respectable members of the medical-scientific community.[40]

34.     By administering the TauSome blood test on former NFL players with the tell-tale signs of CTE and non-NFL players comparatively, "the results showed exosomal tau was significantly elevated in the former NFL players" as compared to the control subjects.[41] And, further confirming Dr. McKee's findings - but now in living subjects - that retired NFL players "with higher levels of the CTE biomarker in their blood score more poorly on standard memory tests and measure of motor skills."[42] The TauSome test is being touted as "a blood test that definitively detects a neurodegenerative brain disorder . . . the first test to identify CTE while the sufferers are still living."[43]

35.     Next, there is the current neuroimaging mode of living-CTE diagnostics. In February of 2015, a prominent American neurosurgeon affiliated with UCLA, Dr. Julian Bailes, announced a special PET scan that is engineered to detect the tau protein in living subjects. The functionality of this test centers around the proprietary radioactive substance that is injected into the bloodstream, called a tracer. This tracer sticks to the tau protein and a PET scan will subsequently reveal the amount of the tracer accumulating in the bloodstream.[44]

36.     Furthering the advancement of this same living-CTE diagnostic technology, in September of 2016, the Journal of Translational Psychiatry announced subsequent neuroimaging

---

[40] J. Alzheimers Dis. 2016;51(4):1099-109
[41] Nick Tate, *Blood Test Identifies Concussion-Related Brain Disorder*, NewsMax (Feb. 29, 2016).
[42] *Id.*
[43] *Id.*
[44] Rick Westhead, *A Possible Breakthrough on Testing CTE*, The Sports Network (Feb. 19, 2015), http://www.tsn.ca/a-possible-breakthrough-on-testing-cte-1.210725

PET scan success by Mount Sinai Medical Center that confirms "imaging results are strikingly similar to well-established postmortem patterns of tau deposition."[45] The foundation of this breakthrough neuroimaging living-CTE diagnosis is based upon a series of tau-specific PET scans performed on a retired NFL player who is known to have sustained 22 concussions and exhibited clinical symptoms consistent with CTE.[46] A concurrent report on Mount Sinai's PET scan results, by the reputable research news team of ScienceDaily, conveys:

> When the new imaging agent (or ligand) [radioactive tau tracer] lights up a PET scan of the brain of a patient showing buildup of tau in a <u>characteristic pattern</u>, the scan result <u>is</u> being interpreted as being consistent with CTE. CTE has a distinctive pattern of tau deposition. The National Institute of Neurological Disorders and Stroke (NINDS) laid out the diagnostic criteria [patterns of tau in CTE-ridden brains] based on samples of postmortem brain tissue. The NINDS used the word 'pathognomonic' to describe the CTE tau pathology pattern. **This is a technical term that indicates that whenever you see this pattern of tau pathology, the diagnosis can be nothing other than CTE. There can be no confusion with other diseases**.[47] (*emphasis added*).

37.     The 39-year old participant of the new PET scan is the first to reveal during life a pattern of tau imaging that outlines the wrinkles and folds of the living brain, just like the 'pathognomonic pattern' described earlier by the NINDS panel as indicative of a brain with CTE.[48] Control subjects do not show this pattern on their PET scans.

38.     For the purposes of this declaratory request it is important to note that the new primary diagnostic tools for detecting CTE in living subjects, in combination with other pertinent empirical evidence (i.e., neuropsychological examination results, history of traumatic brain injury during NFL career) are integral in the flow of logic that makes refusal to compensate a retired

---

[45] D.L. Dickstein, Icahn School of Medicine at Mount Sinai, *Cerebral [18F]T807/AV1451 Retention Pattern in Clinically Probable CTE Resembles Pathognomonic Distribution of CTE Tauopathy*, Journal of Translational Psychiatry (Sept. 27, 2016), http://www.nature.com/tp/journal/v6/n9/full/tp2016175a.html#bib17

[46] *Id.*

[47] Mount Sinai Health System, *Experimental Imaging Agent Reveals Concussion-Linked Brain Disease in Living Brain*, ScienceDaily (Sept. 27, 2016), https://www.sciencedaily.com/releases/2016/09/160927114413.htm

[48] *Id.*

NFL player who suffers with CTE a complete injustice. The development of our neuropsychological understanding of CTE as an occupational disease in combination with our current means of advanced scientific diagnosis makes denying the existence of CTE in living claimants for the purpose of workers' compensation benefits an obvious ploy that is really contrived from the profiteering economics of the NFL and other professional sports institutions.

39.     In furtherance of this argument, along with the TauSome blood test and the CTE PET scan, there is also an array of other supplementary advanced diagnostic technologies that help to solidify the undeniable correlation between earlier traumatic head injury and the living player actually having CTE; which requires ongoing care and financial supplementation during his lifetime. Some of these additional CTE-diagnostics are excerpted:

> Structural imaging aiding in the diagnosis of CTE. Studies using diffuse tensor imaging have shown that diffusion abnormalities, representing microstructural white matter damage, may be associated with repetitive traumatic brain injury. In addition, a handful of cross-sectional magnetic resonance imaging (MRI) studies showing ventricular enlargement and cortical thinning after mild traumatic brain injury, including childhood athletes, retired professional athletes and military veterans, appear to support postmortem findings…
> Molecular imaging is also a promising tool in detecting CTE pathology *in vivo*. Pittsburgh compound B (PiB) amyloid imaging has revealed increased ligand binding following acute traumatic brain imaging…
> We also present longitudinal neuropsychological and structural MRI data revealing patterns that may aid in understanding disease progression and further inform the development of diagnostic criteria [for CTE]…[49]

40.     The main argument here is, not that there are not enough CTE-related deaths to verify the varying diagnostic procedures, as the number of players who are diagnosed with CTE by the above referenced diagnostic technology during their lives and subsequently found to have CTE post-mortem is sure to grow in staggering proportions, and that this type of post-mortem verification is sure to emerge. Rather, our argument rests on the fact that the irrefutable

---

[49] *Id.*, Journal of Translational Psychiatry (Sept. 27, 2016)

combination of living-evidence – including, but not limited to psychological, physiological, behavioral/cognitive, and concussive and sub-concussive brain injury history - viewed in conjunction with the new and preexisting diagnostic technology that shows a marked difference between control subjects' brains and the CTE affected brains of retired NFL players, definitively leads to the conclusion that justice may only be rightfully served to these players by enforcing the Defendant-states to cover CTE-specific occupational disease claims in their workers' compensation statutes. This will cause the NFL's Collective Bargaining Agreement to either live up to its statement that "benefits will be equivalent to those benefits paid under the compensation law of the state in which the club is located,"[50] or to have the NFL Players Association themselves amend their Collective Bargaining Agreement completely in order to provide specifically for living claimants who are presently suffering the horrific consequences of living with CTE.

## JURISDICTION AND VENUE

40.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(11), because there are 30 or more persons whose individual claims are being brought herein and the amount in controversy for each Plaintiff exceeds $75,000.00 dollars, exclusive of costs, interest, and attorneys' fees. The overall amount in controversy exceeds $5,000,000, exclusive of interest, costs, and attorney's fees. These claims can be tried jointly in that they involve common questions of law and fact. In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the claims of individual Plaintiffs who are citizens of a state different from the states of citizenship of all Defendants.

---

[50] *Supra.* NFL Collective Bargaining Agreement

41.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.

42.     Venue is proper in this district pursuant to 28 U.S.C. § 1301 (a)(2) and § 1391 (b)(2) as a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendants conduct substantial business in this jurisdiction.

## PARTIES

43.     Plaintiff, TONY GAITER is a citizen of the United States, and is domiciled in Miami, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. TONY GAITER played in the NFL as a wide receiver for the New England Patriots from 1997 to 1998, and for the San Diego Chargers in 1998. TONY GAITER is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

50.     Plaintiff, SEDRICK IRVIN is a citizen of the United States, and is domiciled in Miami, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. SEDRICK IRVIN played in the NFL as a running back for the Detroit Lions from 1999 to 2001. SEDRICK IRVIN is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

45.     Plaintiff, KEVIN HARRIS is a citizen of the United States, and is domiciled

in Cooper City, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. KEVIN HARRIS played in the NFL as a defensive end for the Dallas Cowboys in 1991. KEVIN HARRIS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

46.     Plaintiff, LAWRENCE JONES is a citizen of the United States, and is domiciled in Boynton Beach, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. LAWRENCE JONES played in the NFL as a wide receiver for the Washington Redskins in 1995. LAWRENCE JONES is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

47.     Plaintiff, SHEVIN SMITH is a citizen of the United States, and is domiciled in Miami, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. SHEVIN SMITH played in the NFL as a safety for the Tampa Bay Buccaneers from 1998 to 1999, and for the Saint Louis Rams in 2000. SHEVIN SMITH is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

48.     Plaintiff, SANTONIO THOMAS is a citizen of the United States, and is domiciled in West Palm Beach, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. SANTONIO THOMAS played in the NFL as a defensive end for the New England Patriots from 2005 to 2007, and for the Cleveland Browns in 2008. SANTONIO THOMAS is currently living and has symptoms that are consistent with a diagnosis of CTE as

a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

49.     Plaintiff, WARREN WILLIAMS is a citizen of the United States, and is domiciled in Fort Myers, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. WARREN WILLIAMS played in the NFL as a running back for the Pittsburgh Steelers from 1988 to 1992, and for the Indianapolis Colts in 1993. WARREN WILLIAMS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

51.     Plaintiff, HENRI CROCKETT is a citizen of the United States, and is domiciled in Cooper City, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. HENRI CROCKETT played in the NFL as a linebacker for the Atlanta Falcons from 1997 to 2001, and for the Minnesota Vikings from 2002 to 2003. HENRI CROCKETT is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL.

52.     Plaintiff, JAMIE NAILS, is a citizen of the United States, and is domiciled in Odum, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. JAMIE NAILS played in the NFL as a guard for the Buffalo Bills from 1997 to 2000, and for the Miami Dolphins from 2002 to 2003. JAMIE NAILS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

53.     Plaintiff, LEON SEARCY, is a citizen of the United States, and is domiciled in Orlando, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. LEON SEARCY played in the NFL as an offensive lineman for the Pittsburgh Steelers from 1992 to 1995, the Jacksonville Jaguars from 1996 to 2000, the Baltimore Ravens in 2001, and for the Miami Dolphins in 2002. LEON SEARCY is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

54.     Plaintiff, MARQUIS JOHNSON, is a citizen of the United States, and is domiciled in Atlanta, Georgia Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. MARQUIS JOHNSON played in the NFL as a cornerback for the Saint Louis Rams from 2010 to 2011, and for the New Orleans Saints in 2012. MARQUIS JOHNSON is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

55.     Plaintiff, LARRY WEBSTER, is a citizen of the United States, and is domiciled in DeLand, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the defensive end for the Miami Dolphins from 1992 to 1994, the Cleveland Browns in 1995, the Baltimore Ravens from 1996 to 2001, and for the New York Jets in 2002. LARRY WEBSTER is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to multiple concussions and repeated head trauma, that were sustained during his career with the NFL.

56.     Plaintiff, COREY FULLER, is a citizen of the United States, and is domiciled in Tallahassee, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. COREY FULLER played in the NFL as cornerback and safety for the Minnesota

Vikings from 1995 to 1998, the Cleveland Browns from 1999 to 2002, and for the Baltimore Ravens from 2003 to 2004. COREY FULLER is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

57.     Plaintiff, MIKE FINN, is a citizen of the United States, and is domiciled in Cedar Hill, Texas. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. MIKE FINN played in the NFL as a tackle for the Pittsburgh Steelers in 1993, and for the Philadelphia Eagles in 1994. MIKE FINN is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

58.     Plaintiff, ERNEST GIVINS, is a citizen of the United States, and is domiciled in Saint Petersburg, Florida.  Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. ERNEST GIVINS played in the NFL as a wide receiver for the Houston Oilers  (now the Tennessee Titans) from 1986 to 1994, and the Jacksonville Jaguars in 1995. ERNEST GIVINS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

59.     Plaintiff, BEN COLEMAN, is a citizen of the United States, and is domiciled in Marietta, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. BEN COLEMAN played in the NFL as a tackle and guard for the Arizona Cardinals from 1993 to 1995, the Jacksonville Jaguars from 1995 to 1999, the San Diego Chargers in 2000, and for the Washington Redskins in 2001.  BEN COLEMAN is currently living and has symptoms

that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

60.     Plaintiff, DEDRICK DODGE, is a citizen of the United States, and is domiciled in Locust Grove, Georgia.   Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. DEDRICK DODGE played in the NFL as a safety for the Seattle Seahawks from 1991 to 1992, for the San Francisco 49ers 1994 to 1996, for the Denver Broncos in 1997, and for the San Diego Chargers 1998. DEDRICK DODGE is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

61.     Plaintiff, DAMON GIBSON, is a citizen of the United States, and is domiciled in Houston, Texas. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. DAMON GIBSON played in the NFL as a wide receiver for the Cincinnati Bengals in 1998, the Cleveland Browns in 1999, the Jacksonville Jaguars from 2001 to 2002, and the Atlanta Falcons in 2002. DAMON GIBSON is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

62.     Plaintiff, MICHAEL GAINES, is a citizen of the United States, and is domiciled in Orlando, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. MICHAEL GAINES played in the NFL as a blocking tight end for the Carolina Panthers from 2004 to 2006, the Buffalo Bills in 2007, the Detroit Lions in 2008, the Chicago Bears in 2009, and for the Cleveland Browns in 2009. MICHAEL GAINES is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

63.     Plaintiff, DEXTER CARTER, is a citizen of the United States, and is domiciled in Jacksonville, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. DEXTER CARTER played in the NFL as a running back for the San Francisco 49ers from 1990 to 1994, the New York Jets 1995, and again for the San Francisco 49ers from 1995 to 1996. DEXTER CARTER is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

64.     Plaintiff, SHOCKMAIN DAVIS, is a citizen of the United States, and is domiciled in Baytown, Texas. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. SHOCKMAIN DAVIS played in the NFL as a wide receiver for the New England Patriots in 2000, and for the Green Bay Packers in 2004. SHOCKMAIN DAVIS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

65.     Plaintiff, TRACY SCROGGINS, is a citizen of the United States, and is domiciled in Fort Lauderdale, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. TRACY SCROGGINS played in the NFL as a linebacker for the Detroit Lions from 1992 to 2001. TRACY SCROGGINS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

66.     Plaintiff, DARRYL ASHMORE, is a citizen of the United States, and is domiciled in Boynton Beach, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. DARRYL ASHMORE played in the NFL as a tackle for

the Los Angeles Rams from 1992 to 1994, the St. Louis Rams from 1995 to 1996, the Washington Redskins from 1996 to 1997, and for the Oakland Raiders from 1998 to 2002. DARRYL ASHMORE is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

67.     Plaintiff, VICTOR FLOYD is a citizen of the United States, and is domiciled in Winter Garden, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. VICTOR FLOYD played in the NFL as a running back for the San Diego Chargers in 1989. VICTOR FLOYD is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

68.     Plaintiff, COREY SIMON is a citizen of the United States, and is domiciled in Tallahassee, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. COREY SIMON played in the NFL as a defensive tackle for the Philadelphia Eagles from 2000 to 2004, the Indianapolis Colts from 2005 to 2006, and for the Tennessee Titans in 2007. COREY SIMON is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

69.     Plaintiff, KELVIN KIGHT is a citizen of the United States, and is domiciled in Loganville, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. KELVIN KIGHT played in the NFL as a wide receiver for the Green Bay Packers in 2004, and for the New England Patriots in 2006. KELVIN KIGHT is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries,

including but not limited to repeated head trauma, that were sustained during his career with the NFL.

70.   Plaintiff, TONY BRYANT is a citizen of the United States, and is domiciled Miramar, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. TONY BRYANT has played for the NFL as a defensive end for the Oakland Raiders from 1999 to 2002, the New Orleans Saints from 2003 to 2005, and for the St. Louis Rams in 2006. TONY BRYANT is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

71.   Plaintiff, ALBERT BENTLEY, is a citizen of the United States, and is domiciled in Fort Myers, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. ALBERT BENTLEY played for the NFL as a running back for the Michigan Panthers in 1984, the Oakland Invaders in 1985, the Indianapolis Colts from 1985 to 1991, and for the Pittsburgh Steelers in 1992. ALBERT BENTLEY is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

72.   Plaintiff, TOBIATH MYLES, is a citizen of the United States, and is domiciled in Lithia Springs, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. TOBIATH MYLES played for the NFL as a tackle for the New York Giants from 1998 to 1999, the Oakland Raiders in 2000, the Cleveland Browns in 2001, and for the Oakland Raiders again in 2001. TOBIATH MYLES is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

73.     Plaintiff, WILLIAM FLOYD, is a citizen of the United States, and is domiciled in Winter Garden, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. WILLIAM FLOYD played for the NFL as a fullback for the San Francisco 49ers from 1994 to 1997, and from the Carolina Panthers from 1998 to 2000. WILLIAM FLOYD is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL. WILLIAM FLOYD has also suffered from various other musculoskeletal injuries while playing professional football.

74.     Plaintiff, CHIDI AHANOTU, is a citizen of the United States, and is domiciled in Tampa, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. CHIDI AHANOTU played in the NFL as defensive end / defensive tackle for the Tampa Bay Buccaneers from 1993 to 2000, the St. Louis Rams in 2001, the Buffalo Bills in 2002, the Miami Dolphins in 2004, and again for the Tampa Bay Buccaneers in 2004. CHIDI AHANOTU is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

75.     Plaintiff, QUINN GRAY, is a citizen of the United States, and is domiciled in Tallahassee, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. QUINN GRAY played in the NFL as quarterback for the Jacksonville Jaguars from 2003 to 2007, and for the Kansas City Chiefs in 2008. QUINN GRAY is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

76.     Plaintiff, CHARLIE CLEMONS, is a citizen of the United States, and is domiciled in Fayetteville, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. CHARLIE CLEMONS played in the NFL as linebacker for the St. Louis Rams from 1997 to 1999, the New Orleans Saints from 2000 to 2001, and for the Houston Texans in 2003. CHARLIE CLEMONS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to concussion and repeated head trauma, that were sustained during his career with the NFL. CHARLIE CLEMONS has also suffered from various other musculoskeletal injuries while playing professional football.

77.     Plaintiff, WALLY WILLIAMS, is a citizen of the United States, and is domiciled in Tallahassee, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. WALLY WILLIAMS has played in the NFL as guard for the Cleveland Browns from 1993 to 1995, the Baltimore Ravens from 1996 to 1998, and for the New Orleans Saints from 1999 to 2002. WALLY WILLIAMS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

78.     Plaintiff, JEFFERY HUNTER, is a citizen of the United States, and is domiciled in Albany, Georgia. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. JEFFERY HUNTER played in the NFL as defensive end for the Phoenix Cardinals (as an offseason member) in 1989, the Buffalo Bills in 1990, the Detroit Lions from 1990 to 1992, the Miami Dolphins from 1992 to 1993, and for the Tampa Bay Buccaneers in 1994. JEFFERY HUNTER is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

79.     Plaintiff, ANTHONY FIELDINGS, is a citizen of the United States, and is domiciled in Apopka, Florida. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. ANTHONY FIELDINGS played in the NFL as linebacker for the Dallas Cowboys in 1995. ANTHONY FIELDINGS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

80.     Plaintiff, DWAN EPPS, is a citizen of the United States, and is domiciled in Pearland, Texas. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. DWAN EPPS played in the NFL as linebacker for the Seattle Seahawks in 2000. DWAN EPPS is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during his career with the NFL.

81.     Plaintiff, JAMES JOHNSON, is a citizen of the United States, and is domiciled in Port Arthur, Texas. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met. JAMES JOHNSON played in the NFL as running back for the Cincinnati Bengals in 2008. JAMES JOHNSON is currently living and has symptoms that are consistent with a diagnosis of CTE as a result of injuries, including but not limited to repeated head trauma, that were sustained during is career with the NFL.

82.     Defendant, National Football League, Inc., is a for profit trade organization with its principal place of business at 280 Park Avenue, New York, NY 10017, and is domiciled in the state of New York. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

83.     Defendant, Minnesota Vikings Football Club, L.L.C. ("Vikings"), is a for profit trade organization pursuant to is § 501(c)(6) with its principal place of business at 755 East Mulberry #600, San Antonio, Texas 78212, and is domiciled in the state of Minnesota. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Vikings have played several times in Florida. As such, and as the Vikings derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida.  This Court therefore has personal jurisdiction over the Vikings. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

84.     Defendant, Miami Dolphins, Ltd. ("Dolphins"), is a for profit trade organization with its principal place of business at 347 Don Shula Drive, Miami Gardens, Florida 33056, and is domiciled in the state of Florida. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Dolphins are located, practice, and play in Florida. The Dolphins derive substantial revenue from and are taxed by State and Local authorities for games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

85.     Defendant, Baltimore Ravens LP ("Ravens"), is a for profit trade organization with its principal place of business at 1 Winning Drive, Owings Mills, Maryland 21117, and is domiciled in the state of Maryland. Defendant has had several games in Florida. This court therefore has personal jurisdiction over the Ravens. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

86.     Defendant, The St. Louis Rams, LLC, individually and as successor in interest to the Los Angeles Rams ("Rams"), is a for profit trade organization with its principal place of business at 211 North Stadium Boulevard, Suite 201, Columbia, Missouri 65203, and is domiciled in the state of Missouri. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Rams have had games in Florida, and as the Rams derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Rams. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

87.     Defendant, New York Jets, LLC ("Jets"), is a for profit trade organization with its principal place of business at 50 West 57th Street, 2nd Floor, New York, New York 10019, and is domiciled in the state of New York. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.  The Jets have had several games in Florida. As such, and as the Jets derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Jets. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

88.     Defendant, Cleveland Browns Football Club, LLC ("Browns"), is a for profit trade organization with its principal place of business at 1300 East Ninth Street, Cleveland, Ohio 44114, and is domiciled in the state of Ohio. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Browns have played many games in Florida. As such, and as the Browns derive substantial revenue from and

are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Browns. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

89.     Defendant Philadelphia Eagles, LLC ("Eagles) is a for profit trade organization with its principal place of business at 1 Novacare Way, Philadelphia, Pennsylvania 19145, and is domiciled in the state of Pennsylvania. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Eagles have played many times in Florida. As such, and as the Eagles derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Eagles. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

90.     Defendant, Jacksonville Jaguars, LLC ("Jaguars"), is a for profit trade organization with its principal place of business at One Everbank Field Drive, Jacksonville, Florida 32202, and is domiciled in the state of Florida. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Jaguars are located in Florida and play many games in Florida. As such, and as the Jaguars derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida.  This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

91.     Defendant, Arizona Cardinals Club, LLC, individually and as successor to the Phoenix Cardinals, St. Louis Cardinals, and Chicago Cardinals (collectively "Cardinals"), is a

for profit trade organization with its principal place of business at 1209 Orange Street, New Castle, Delaware 19801, and is domiciled in the state of Arizona. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Cardinals have played a couple of games in Florida. As such, and as the Cardinals derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Cardinals. to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

92.     Defendant, PDB Sports, Ltd. ("Broncos"), is a for profit trade organization with its principal place of business at 13655 Broncos Parkway, Englewood, Colorado 80112, and is domiciled in the state of Colorado. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Broncos have had several games in Florida. As such, and as the Broncos derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

93.     Defendant, Atlanta Falcons Football Club, LLC ("Falcons"), is a for profit trade organization with its principal place of business at 4400 Falcon Parkway, Flowery Branch, Georgia 30542, and is domiciled in the state of Georgia. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Falcons have been scheduled to play in Florida various times. As such, and as the Falcons derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into

Court in Florida. This Court therefore has personal jurisdiction over the Falcons. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

94.     Defendant, The Chicago Bears Football Club, Inc. ("Bears"), is a for profit trade organization with its principal place of business at 1920 Football Drive, Lake Forest, Illinois 60045, and is domiciled in the state of Illinois. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. As the Bears derive substantial revenue from and are taxed by State and Local authorities for games played in Florida, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Bears. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

95.     Defendant, Indianapolis Colts, Inc., individually and as successor to the Baltimore Colts, which were a resident of the State of Maryland until 1983 ("Colts"), is a for profit trade organization with its principal place of business at 7001 West 56th Street, Indianapolis, Indiana 46254, and is domiciled in the state of Indiana. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Colts have played many times in Florida. As such, and as the Colts derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Colts. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

96.     Defendant, Forty Niners Football Company LLC ("49ers"), is a for profit trade organization with its principal place of business at 4949 Marie P Debartolo Way, Santa Clara, California 95054, and is domiciled in the state of California. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL.

Since the 49ers have played games in Florida, and as the 49ers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

97.     Defendant, New England Patriots, LLC ("Patriots"), is a for profit trade organization with its principal place of business at One Patriot Place, Foxborough, Massachusetts 02035, and is domiciled in the state of Massachusetts. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Patriots have had many games in Florida. As such, and as the Patriots derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

98.     Defendant, The Detroit Lions, Inc. ("Lions"), is a for profit trade organization with its principal place of business at 1901 St Antoine Street, 6th Floor at Ford Field, Detroit, Michigan 48226, and is domiciled in the state of Michigan. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Defendant has had several games in Florida. This court therefore has personal jurisdiction over the Lions. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

99.     Defendant, Pro-Football, Inc., d/b/a The Washington Redskins ("Redskins"), is a for profit trade organization with its principal place of business at 21300 Redskin Park Drive, Ashburn, Virginia 20147, and is domiciled in the state of Virginia. Defendant has played many games in Florida. As such, and as the Redskins derive substantial revenue from and are taxed by

State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Redskins. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

100.    Defendant, Chargers Football Company, LLC ("Chargers"), is a for profit trade organization with its principal place of business at 4020 Murphy Canyon Road, San Diego, California 92123, and is domiciled in the state of California. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Chargers have participated in several games in Florida. As such, and as the Chargers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Chargers. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

101.    Defendant, Tennessee Football, Inc., individually and as successor in interest to the Houston Oilers ("Titans"), is a for profit trade organization with its principal place of business at 460 Great Circle Road, Nashville, Tennessee 37228, and is domiciled in the states of Tennessee. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Titans have played many games in Florida. As such, and as the Titans derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Titans. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

102.     Defendant, Green Bay Packers, Inc. ("Packers"), is a for profit trade organization with its principal place of business at 1265 Lombardi Avenue, Green Bay, Wisconsin 54304, and is domiciled in the state of Wisconsin. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Packers have participated in several games in Florida. As such, and as the Packers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

103.     Defendant, The Oakland Raiders, LLP, individually and as successor in interest to the Los Angeles Raiders ("Raiders"), is a for profit trade organization with its principal place of business at 1220 Harbor Bay Parkway, Alameda, California 94502, and is domiciled in the state of California. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Raiders have participated in games in Florida. As such, and as the Raiders derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Raiders. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

104.     Defendant, Pittsburgh Steelers, LLC ("Steelers"), is a for profit trade organization with its principal place of business at 3400 South Water Street, Pittsburgh, Pennsylvania 15203, and is domiciled in the state of Pennsylvania. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Steelers have participated and played in many games in Florida. As such, and as the Steelers derive substantial

revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Steelers. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

105.    Defendant, New York Football Giants, Inc. ("Giants"), is a for profit trade organization with its principal place of business at 1925 Giants Drive, East Rutherford, New Jersey 07073, and is domiciled in the state of New Jersey. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating and regulating the NFL. The Giants have participated in many games in Florida. As such, and as the Giants derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

106.    Defendant, Panthers Football, LLC ("Panthers"), is a for profit trade organization with its principal place of business at 800 South Mint Street, Charlotte, North Carolina 28202, and is domiciled in the state of North Carolina. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Panthers have played many times in Florida. As such, and as the Panthers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

107.    Defendant, Buccaneers LP ("Buccaneers"), is a for profit trade organization pursuant to is § 501(c)(6) with its principal place of business at One Buccaneer Place, Tampa,

Florida 33607, and is domiciled in the state of Florida. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Buccaneers have participated in games in Florida. As such, and as the Buccaneers derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over them. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

108. Defendant, Kansas City Chiefs Football Club, Inc. ("Chiefs"), is a for profit trade organization with its principal place of business at One Arrowhead Drive, Kansas City, Missouri 64129, and is domiciled in the state of Missouri. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Chiefs have visited and play games in Florida. As such, and as the Chiefs derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Chiefs. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

109. Defendant, Houston NFL Holdings LP ("Texans"), is a for profit trade organization with its principal place of business at 109 North Post Oak Lane, Suite 600, Houston, Texas 77024, and is domiciled in the state of Texas. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Texans have come to Florida to play games a couple of times. As such, and as the Texans derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into

Court in Florida.  This Court therefore has personal jurisdiction over the Texans. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

110.    Defendant, New Orleans Saints, LLC ("Saints"), is a for profit trade organization with its principal place of business at 100 Sandau, #210, San Antonio, Texas 78216, and is domiciled in the state of Texas. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating and regulating the NFL. Saints have played several games in Florida. As such, and as the Saints derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Saints. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

111.    Defendant, Buffalo Bills, LLC ("Bills") is a for profit trade organization with its principal place of business at 7777 Northwest Beacon Square Boulevard, Boca Raton, Florida 33487, and is domiciled in the state of Florida. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Bills have played games in Florida, and as the Bills derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Bills. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

112.    Defendant, Dallas Cowboys Football Club, Ltd. ("Cowboys"), is a for profit trade organization with its principal place of business at 1 Cowboys Parkway, Irving, Texas 75063. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Cowboys have played in Florida on numerous occasions.

As such, and as the Cowboys derive substantial revenue from and are taxed by State and Local authorites for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Cowboys.

113.    Defendant, Football Northwest, LLC ("Seahawks"), is a for profit trade organization with its principal place of business at 12 Seahawks Way, Renton, Washington 98056, and is domiciled in the state of Washington. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. The Seahawks have played many games in Florida. As such, and as the Seahawks derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida. This Court therefore has personal jurisdiction over the Seahawks. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

114.    Defendant, Cincinnati Bengals, Inc. ("Bengals"), is a for profit trade organization with its principal place of business at One Paul Brown Stadium, Cincinnati, Ohio 45202, and is domiciled in the state of Ohio. Defendant is engaged in interstate commerce in the business of, among other things, promoting, operating, and regulating the NFL. Since the Cincinnati Bengals have played many games in Florida, and as the Bengals derive substantial revenue from and are taxed by State and Local authorities for those games, they have the requisite minimum contacts with Florida and can reasonably anticipate being brought into Court in Florida.  This Court therefore has personal jurisdiction over the Bengals. Pursuant to 28 U.S.C. § 1332(d)(2)(a), the requirements of minimal diversity have been met.

## COUNT I

## ACTION FOR DECLARATORY RELIEF

115.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

116.    The Declaratory Judgement Act 28 U.S.C. 2201 provides that where there is a controversy within its jurisdiction "any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

117.    The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth *in Grand Trunk R.R.Co v. Consol. Rail Corp*., 746 F. 2d, 323, 326 (6th Cir. 1984). The facts of this case as above herein, amply meet the *Grand Trunk* criteria. This ruling states that, "We must be able to ensure that the District Court exercises its discretion to grant declaratory relief when the need for uniformity or another overriding policy consideration suggests the need for settlement." Further, the opinion states that "the policy in favor rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the [proposed multitude of workers' compensation] proceedings." *Id.*

118.    Lastly, as addressed above, due to the burgeoning scientific and statistical empirical evidence that sufficient living-CTE diagnoses now exist, combined with NFL-Defendants long-standing and steadfast inclination to deny Plaintiff's living-CTE workers' compensation claims, our declaratory request fulfills the "actual controversy" requirement of the Declaratory Judgement Act.

119.    All of the above ties together making our plea for declaratory relief suitable for judicial review in meeting the requirements of the Ripeness Doctrine; also addressed in detail herein.

## COUNT II

## ACTION FOR INJUNCTIVE RELIEF AGAINST NFL DEFENDANTS

120.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

121.    Pursuant to 28 U.S.C. § 2201, and, if no relief is granted, (1) that there is a likelihood of irreparable harm with no adequate remedy at law, (2) that the balance of harm favors the movant, (3) that there is a likelihood of success on the merits of the case, and (4) that the public interest favors the granting of the injunction, Plaintiffs seek injunctive relief as to the following as against NFL-Defendants:

   a) That the court enjoin NFL-Defendants to immediately amend their
      Collective Bargaining Agreement [specifically Article 41 - Workers'
      Compensation, Article 58 – 88 Benefit, Article 65 – Neuro-Cognitive
      Disability Benefit, and/or any relevant newly contemplated section(s) of
      the Agreement], to define living-CTE as a compensable occupational
      disease for Plaintiffs who:

      1. Have sustained severe concussive and sub-concussive traumatic
         head injury during their terms playing for the NFL;

      2. Present with a clinical diagnosis of CTE through qualified
         neuropsychological evaluation;

3. Test positive under one or more of the recently announced living-CTE diagnostic procedures described herein, including but not limited to additional forthcoming successful living-CTE diagnostic procedures as they arise;

4. Establish that they are suffering the physical and financial effects of living with CTE.

122.   There is no question whether Plaintiffs have a justifiable cause to seek CTE-specific workers' compensation benefits from NFL-Defendants, and there is no question that NFL-Defendants will avidly deny workers' compensation benefits specifically for the occupational disease of CTE.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs and Plaintiffs' Spouses pray for judgment as follows:

A. Declaratory and injunctive relief described herein be duly granted.

## **JURY DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand

a trial by jury on all issues so triable.

Dated: November 21, 2016.

Respectfully submitted,

/s/ Tim Howard

Tim Howard, J.D., Ph.D
Florida Bar No.: 655325
HOWARD & ASSOCIATES, P.A.
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
Telephone: (850)298-4455
Fax: (850) 216-2537
tim@howardjustice.com

Miguel A. Amador, Esq.
Florida Bar No.: 47292
HOWARD & ASSOCIATES, P.A.
101 NE Third Ave., Ste. 1500
Fort Lauderdale, FL 33301
Office: (954) 332-3633
Fax: (850) 216-2537
miguel@howardjustice.com